535 F.Supp. 697 (1982)
UNITED TRANSPORTATION UNION, Plaintiff,
v.
CONSOLIDATED RAIL CORPORATION, Defendant,
and
CONSOLIDATED RAIL CORPORATION, Plaintiff,
v.
UNITED TRANSPORTATION UNION, et al., Defendants.
Thomas CANNON, Robert Stillwell, Donald R. Brewer, and David L. Peterson, On Behalf of Themselves and all Other Similarly Situated "Firemen" and "Train Service Employees" Affected by the Northeast Rail Service Act of 1981, Plaintiffs,
v.
CONSOLIDATED RAIL CORPORATION, Defendant.
Civ. A. Nos. 82-4, 82-7 and 82-2.
Special Court Regional Rail Reorganization Act.
March 31, 1982.
Certiorari Denied June 21, 1982.
*698 Norton N. Newborn, Gaines & Stern Co., L.P.A., Cleveland, Ohio, for the United Transportation Union.
Harry A. Rissetto, E. Carl Uehlein, Jr., Thomas E. Reinert, Jr., and Donald L. Havermann, Washington, D. C. and Dennis Alan Arouca, and David S. Fortney, Philadelphia, Pa. (Morgan, Lewis & Bockius, Washington, D. C., of counsel), for Consolidated Rail Corp.
Elizabeth A. Rodgers, Doyle, Playter, Novick & Berkin, Boston, Mass., for UTU Local Committee of Adjustment No. 1473, Local Chairmen Connors, Maloof and Casey.
Ronald L. Gilardi and Richard D. Gilardi, Gilardi & Cooper, Pittsburgh, Pa., for J. L. Arnold and Local 1418.
Cornelius D. Murray, Albany, N. Y. (O'Connell & Aronowitz, P. C., Thomas F. Gleason, Albany, N. Y., of counsel), for Thomas Cannon, et al.
J. Paul McGrath, Asst. Atty. Gen., Raymond M. Larizza, and Christine Nicholson, Dept. of Justice, Washington, D. C. (John H. Broadley, Chief Counsel and Grady C. Cothen, Jr., Federal Railroad Administration, Dept. of Transportation, Washington, D. C., of counsel), for the United States as defendant-intervenor.
*699 Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
Certiorari Denied June 21, 1982. See 102 S.Ct. 2960.
FRIENDLY, Presiding Judge:
In this opinion we decide three cases, of which we have jurisdiction under § 1152(a) of the Northeast Rail Service Act of 1981 (NRSA), Pub.L.No. 97-35, 95 Stat. 357, relating to § 702 which was added to the Regional Rail Reorganization Act of 1973 (the RRR Act) by § 1143(a) of NRSA. We set forth the entire section in the margin.[1]
*700 In No. 82-4, filed on February 4, 1982, United Transportation Union (UTU) sought a judgment declaring that Consolidated Rail Corporation (Conrail) may sever employees pursuant to § 702 and fail or refuse to fill vacancies created by the severance of employees pursuant to § 702 only when such failure or refusal is not inconsistent with collective bargaining agreements. The complaint brought into question the interpretation of the statute and raised no issue of unconstitutionality.
On February 22, 1982, Conrail brought No. 82-7 against UTU; its president F. A. Hardin; 15 UTU General Committees for Adjustment; 19 UTU General Chairmen; 8 UTU Local Unions or Committees of Adjustment; 11 UTU Local Chairmen; and John Doe, a Conrail employee. Conrail sought to enjoin a strike allegedly threatened by defendants or certain of them to enforce the interpretation of § 702 which constituted the basis for UTU's action, No. 82-4. Conrail contended that its activities were authorized by § 702; it argued alternatively that defendants' threatened conduct violated the Railway Labor Act, 45 U.S.C. § 151 et seq., a position no longer seriously pressed. Conrail requested a temporary restraining order and, after hearing, a preliminary injunction to be made permanent on final hearing, and damages. At a hearing on February 22, 1982, before Judge Thomsen, after he had indicated his intention to issue a temporary restraining order, it was agreed that a preliminary injunction should issue and that the case would be finally heard on March 10, 1982, along with No. 82-4, with which it was consolidated. The parties entered into stipulations of fact in both cases. UTU moved for summary judgment on the basis of these stipulations. Conrail moved for summary judgment on the basis of the stipulations and an affidavit of R. E. Swert, its Vice President, Labor Relations, accompanied by numerous exhibits. The United States was allowed to intervene in support of Conrail.
The third action, No. 82-2, Cannon et al. v. Consolidated Rail Corporation, was brought by two firemen and two brakemen as a class action on behalf of the class (or sub-class) of Conrail firemen and train service employees whether presently working or furloughed. The first count of the complaint alleged, as did UTU's complaint in No. 82-4, that § 702 should not be interpreted as permitting violations of the collective bargaining agreementsa position abandoned by counsel at oral argument (Transcript at 22-24.) The second count alleged that the provisions of § 702 authorizing Conrail to force severance and to "blank" positions vacated thereby in violation of collective bargaining agreements were unconstitutional. The complaint sought declaratory and injunctive relief and backpay. This court having issued a certificate pursuant to 28 U.S.C. § 2403(a) that the constitutionality of an act of Congress had been drawn into question, the United States sought and was granted leave to intervene as a defendant. Both sides moved for summary judgment. By agreement the case, although not consolidated, was heard along with Nos. 82-4 and 82-7 on March 10, 1982.
The facts are not in dispute: As required by § 702(b) and (c), Conrail moved swiftly to implement that section. Although, as discussions before the legislative committees had indicated,[2] Conrail intended to use *701 subsection (a) to separate 4600 employees, consisting of 1300 engine service employees and 3300 train service employees, it in fact determined that it would initially terminate 3633 employees, consisting of 1303 engine service employees and 2321 train service employees, Attachment to Affidavit of R. E. Swert, March 16, 1982, and gave the notices required by § 702(c)(1) and (2). See Joint Exhibit H in No. 82-4; Stipulation of Facts D.6 in No. 82-4. On October 28, 1981, Conrail sought applications for voluntary terminations of 300 engine service and 300 train service employees at 31 locations; 583 employees applied for the former and 1157 for the latter. (Stipulation of Facts D.11 in No. 82-4; Affidavit of R. E. Swert, March 4, 1982, ¶ 35.) On or about December 7 Conrail terminated the employment of the 600 employees and "blanked" their positions as mandated by § 702(e)(1) or permitted by § 702(e)(2). On January 7, 1982, Conrail solicited applications for 1660 voluntary terminations at 54 locations for engine service employees and at 60 for train service employees. (Stipulation of Facts D.13 in No. 82-4.) A sufficient number of applications having been made, Conrail terminated that number of employees on or about February 22, 1982. (Stipulation of Facts D.17 in No. 82-4; Affidavit of R. E. Swert, March 4, 1982, ¶¶ 41-42.) This leaves 2340 employees who may be terminated and whose positions may be blanked, see footnote 1, last paragraph. Compulsory termination under § 702(d) became possible on March 10, 1982. The funds for the allowance incident to these terminations were provided to Conrail under a February 6, 1982 Grant Agreement with the Federal Railroad Administration.

DISCUSSION

1. The History of the Problem

The efforts of the nation's railroads to rid themselves of what they consider to be unnecessary firemen and second and third brakemen in freight service have had a long history. See Chicago & N. W. R. Co. v. United Transportation Union, 402 U.S. 570, 573, 91 S.Ct. 1731, 1733, 29 L.Ed.2d 187 (1971) (citing authorities). This included the appointment of a Presidential Railroad Commission in 1960[3] and of Emergency Board No. 154 in 1963, and the adoption of a Joint Resolution, 77 Stat. 132, which established a seven-man tripartite board, Arbitration Board No. 282, which was to render a binding award effective for two years.[4] Overmanning became an issue in the Penn Central reorganization, resulting in an opinion by the reorganization judge which recommended that management set crew size unilaterally. In re Penn Central Transportation Co., 347 F.Supp. 1356, 1367 (E.D.Pa.1972). After having invoked the procedures of the Railway Labor Act without success, the Trustees in February, 1972, began the unilateral reduction of crews and UTU responded by calling a systemwide strike. Congress stepped in by enacting Public Law No. 93-5, 87 Stat. 5, which in effect rescinded the Trustees' reduction of crew size.
Neither the RRR Act of 1973 nor the RRRR Act of 1976 contained any provision dealing directly with the problem of overmanning. In September, 1978, Conrail negotiated a Crew Consist Agreement with UTU which allowed Conrail to reduce certain freight crews from one conductor and two brakemen to one conductor and one brakeman; however, Conrail could eliminate the second brakeman position only in the absence of available trainmen with seniority dates prior to the date of the agreement. The hiring of firemen continued to be governed by the Fireman Manning Agreement of July 19, 1972. This, in effect, *702 allowed the carriers to dispense with "fire-men-helpers" in engines other than those in passenger, hostler and hostler-helper service, keeping an adequate number in training to provide engineers, but firemen having seniority on the date of the agreement could exercise this with respect to any position for which the use of firemen would have been required under the National Diesel Agreement of 1950 as in effect on January 24, 1964.
While attrition would have gradually eliminated the "protected employees" under these agreements in time if traffic had grown or even remained static, traffic declined sharply.[5] By 1980 it had become apparent not only to Conrail but to the United States Railway Association (US RA) and the General Accounting Office that the projected savings were not being and would not be realized.[6] Indeed, the overall decline in traffic resulted in an increase in the number of trains on which Conrail has had to employ firemen.[7]
Section 405 of the Staggers Rail Act of 1980, Pub.L.No. 96-448, 94 Stat. 1895, authorized federal funding of a Conrail workforce reduction program if this would result in "substantial savings" to the United States. After study Conrail concluded that a severance program for train and engine service employees would be generally beneficial if, but only if, Conrail also could eliminate one position for every employee separated since otherwise the position vacated would be filled by a protected employee's exercising seniority rights. These conclusions were reported to the OMB, the FRA, the ICC and the UTU in January, February, and March 1981.[8] In all these presentations Conrail projected a surplus of 1300 firemen and 3300 brakemen.
On March 15, 1981, Conrail made a series of reports to Congress as required by § 703(c) of the Staggers Act, one of these being "an analysis of the effects upon the corporation and its employees of alternative changes in labor agreements and related operational changes." Conrail, Labor Report to Congress: Response to Staggers Act Section 703(c), at 1 (March 15, 1981). The report noted that Conrail's freight labor cost ratio had been reduced from 66% in 1977 to 56% in 1981 but that this compared adversely with a ratio of 48% for the industry excluding Conrail, an annual difference to Conrail of more than $300 million. Id. Reduction of the ratio would require heavy sacrifices by Conrail employees, which, however, would be much less than what would result if Conrail failed to become a viable carrier and were sold piecemeal to other carriers. Id. The labor contributions were to consist partly of a $200 million deferral in wage increases in the 1981 round of collective bargaining and partly by "elimination of about 10,000 employees and acceleration of savings permitted by productivity agreements already negotiated." Id. (Emphasis in original; footnote omitted.)[9] The report stated that a portion of the 10,000 reduction in Conrail employees could come from surplus train and engine employees but that:
current labor contracts, although recognizing that firemen and second brakemen *703 are not necessary for safe operation, provide for elimination of these employees only through attrition. It is clear that normal attrition itself, particularly in the environment of a declining traffic base, will not reduce Conrail's work force at a rate necessary for it to realize the benefits of these agreements in the near term.
Early in 1981 negotiations occurred between Conrail and the unions representing its employees including UTU. These culminated in a Labor Contribution Agreement dated May 5, 1981. This provided for changes in the national agreements with respect to wages estimated to produce savings of $200 million per annum, see, e.g., Senate Hearing II, at 35-38 (testimony of James E. Burke, Vice President, United Transportation Union), 2-3 (testimony of L. Stanley Crane, Chairman and Chief Executive Officer, Conrail), and a moratorium on the service or processing of notices under § 6 of the Railway Labor Act. At the same time representatives of Conrail and of UTU were negotiating with respect to the elimination of firemen and brakemen positions. According to Swert's affidavit, ¶ 20, this resulted in the joint submission to the House Committee on Energy and Commerce and the Senate Committee on Commerce, Science and Transportation of a proposal generally similar to § 702 as enacted.[10]

2. The Meaning of § 702

UTU argues that § 702, and particularly § 702(d) and (e), were not intended to allow Conrail to take action contravening the Fireman Manning Agreement and the Crew Consist Agreement. While its making the argument is understandable in light of the historic reluctance of both labor and management to have Congress take unto itself the resolution of labor disputes, we find the argument wholly lacking in force. Indeed, the plaintiffs in No. 82-2 join with Conrail and the United States in the view that the section was intended to supersede contrary agreements.
We look first at the words of the statute, Southeastern Community College v. Davis, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979); Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977), and it is hardly necessary to do more. The very first sentence of § 702 says that Conrail "may terminate the employment of certain employees, in accordance with this section", not that Conrail may do so if permitted by agreement. Subsection (d) dealing with involuntary separation says that Conrail "may, after 210 days after the effective date of this title, designate for separation employees in engine service or train service respectively in inverse order of seniority" etc. No qualification is made on the score of existing agreements. The first reference to representatives of employees comes in § 702(e)(3), and this for the very limited purpose there stated and with Conrail having the right to decide if no agreement is reached. Subsection 702(e)(4) retains Conrail's contract rights to refrain from filling positions but, significantly, says nothing about the contract rights of employees. Section 702(f) says that Conrail and employee representatives "may agree on procedures to implement this section, but the absence of such agreement shall not interfere with implementation of the separations authorized by this section." Finally, if there were need for further dotting of i's or crossing of t's, § 702(g) makes mandatory Conrail's separation of firemen in commuter service, which clearly intends no restraint by existing agreements to the contrary.
*704 The compelling force of the language is augmented by other considerations discernible from the face of the statute. One is UTU's inability to suggest what purpose the elaborate provisions of § 702 would serve under its construction. Conrail required no authorization from Congress to do what existing agreements permitted or to negotiate for changes in them. There can be no valid claim that § 702 was needed to insure that any actions taken by Conrail of the sort therein specified would not run afoul of state full crew laws; that office was already performed by § 711.[11]
A second consideration is that § 702 must be read in the light of Title IV which § 1142 of NRSA added to the RRR Act. Section 403 requires USRA to make profitability determinations with respect to Conrail on June 1, 1983, and again as soon after November 1, 1983, as the necessary information is available. Failure of Conrail to pass either test requires the Secretary of Transportation to initiate discussions and negotiations under § 405 for the break-up of Conrail's freight service, §§ 403(a)(3)(B) and (b)(3)(B).[12] It was in the interest of both Conrail and labor that savings incident to the § 702 program should begin as early as possible  not await the result of lengthy and possibly fruitless negotiations for amendment of the Fireman Manning and Crew Consist Agreements.[13]
With the language of § 702 so clear and the necessity of a literal reading in order to conform with the overall purpose of the statute so manifest, it is scarcely necessary to resort to legislative history. If we do, the answer given by the reports of the Senate, House and Conference Committees is equally plain.
The House Report on H.R. 3559, a predecessor to NRSA, said "this title also provides Conrail the opportunity to eliminate unnecessary jobs. Unneeded firemen and brakemen are eliminated upon payment of a termination allowance, saving the Corporation more than $100 million." H.R. Rep.No. 97-153, 97th Cong., 1st Sess., at 3 (1981). More specifically, the report described a section of H.R. 3559, which was almost identical to § 702 as enacted, in the following terms:
Section 702 permits Conrail to accelerate the implementation of the crew consist and fireman manning agreements so that all excess firemen and all second and third brakemen can be eliminated before the end of calendar year 1982. The firemen on the crews of trains operated in commuter service must be included by the Corporation in the termination program.
Id. at 30.
The Senate Report described § 413-1 of S. 1377, a forerunner of § 702, in similar terms:
[Section 413-1] contains a "Special Termination Allowance" allowing Conrail to "blank" the positions (eliminate the job with the man) vacated under the program. Separations would be limited to *705 the numbers of excess firemen and second and third brakemen (including passenger firemen) presently employed by Conrail (but not necessarily the individuals occupying those positions if more senior personnel wish to be separated). About 4,600 positions are at issue, and their elimination would make the properties more saleable. This was addressed in the Conrail settlement after the DOT bill was introduced.
The program would operate at the direction of Conrail but mandatorily as to affected employees (after voluntary separations were taken). The section provides for payments at the rate of $200 per month of active service with Conrail or a predecessor, with a cap of $25,000 (i.e., 4 years, 2 months of service) [sic].
S.Rep.No. 97-139, 97th Cong., 1st Sess., at 332, U.S.Code Cong. & Admin.News 1981, pp. 397, 620. The House and Senate conferees took the same view, saying "the purpose of this program is to eliminate 4,600 employee positions; 3,300 brakemen and 1,300 firemen. In addition, all the firemen in commuter service are to be included in this program. This will result in the elimination of firemen positions in commuter service." Explanatory Statement, supra, at 127 Cong. Rec.S 9061 (daily ed. July 31, 1981); 127 Cong.Rec.H 5962 (daily ed. August 4, 1981).
In none of these statements is there any indication that collective bargaining agreements were intended to limit the operation of § 702; indeed, the section was described as allowing Conrail "to accelerate the implementation of the crew consist and fireman manning agreements." Likewise, the principal concern reflected in the reports is ensuring that Conrail actually is able to eliminate the excess positions in question prior to the end of 1982, an outcome that UTU's reading of the provision would be unlikely to permit.
Both Conrail and UTU have referred to a multitude of materials submitted to Congress in the course of the deliberations leading to the enactment of § 702. Conrail regards these as showing knowledge by the committees of Congress that the termination program would not be effective unless Conrail had the right to enforce it, including the blanking of positions, irrespective of the assent of the UTU. The latter finds solace in some references to negotiation by Conrail representatives. We find it unnecessary to pursue the subject. Our concern is not so much with what Conrail sought as with what Congress wrought. With respect to that, the language and evident purpose of the statute and the committee reports leave no room for even the smallest doubt. When the evidence revealed by an excursion into materials simply forming a part of the basis on which Congress acted is "sufficiently ambiguous ... to invite mutually destructive dialectic but not strong enough either to strengthen or weaken the force of what Congress has enacted," a court should disregard it. FCC v. Columbia Broadcasting System, 311 U.S. 132, 136-37, 61 S.Ct. 152, 153-154, 85 L.Ed. 87 (1940).

3. Constitutionality: Due Process and Equal Protection

Plaintiffs in No. 82-2 challenge the constitutionality of § 702 on a number of grounds. They contend that the compulsory separation provisions of § 702(d) and the "blanking" provisions of § 702(e) violate the Fifth Amendment's prohibitions of the deprivation of property without due process of law and the taking of private property for public use without just compensation. They contend also that the concept of equal protection of the laws held to be embodied in the due process clause of the Fifth Amendment, see Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), is violated by § 702(a)'s $25,000 ceiling on termination allowances and by the fact that § 702 applies only to Conrail. For convenience we will refer to the two former contentions as the due process contentions and to the last as the equal protection contentions.
Before discussing the due process contentions it will be useful to analyze what sacrifices § 702 in fact imposes and why Congress imposed them. Clearly the employees who opt for voluntary termination have no *706 constitutional claim. By no means will every employee who may be subjected to compulsory termination lose his employment; if he has seniority, he may exercise this to transfer to another location. Some, of course, will be terminated, but normally they will be employees with low seniority, whom Conrail was free to furlough without benefit of § 702 if their services were not needed. Section 702(e) does not in itself result in the loss of a job; it simply prevents an employee from using seniority rights to bid for a superior position formerly held by a terminated employee.
As against this Congress had reason to consider that § 702 would serve important public objectives. Its purposes, NRSA § 1133, so far as here relevant, were to provide for "(1) the removal by a date certain of the Federal Government's obligation to subsidize the freight operations of Conrail" and "(3) an orderly return of Conrail freight service to the private sector." The preferred method for accomplishing this was to make Conrail profitable, thereby permitting its continued existence or its sale as a single entity to private interests. Failure to achieve profitability would have catastrophic consequences. Projected loss of employment from piecemeal sale was estimated to exceed 45,000. See USRA, Conrail at the Crossroads: The Future of Rail Service in the Northeast, at 51 (April 1981) and note 12 supra. This would impair the solvency of the Railroad Retirement System, see H.Rep.No. 97-153, 97th Cong., 1st Sess., at 153 (1981); S.Rep.No. 97-101, 97th Cong., 1st Sess., at 105 (1981), recently the subject of legislative effort to restore its soundness, see Pub.L.No. 97-34, § 741. The new federally funded employee protection program, which § 1143(a) of NRSA added as § 701 of the RRR Act, would be prematurely exhausted, as would the railroad unemployment insurance fund, see H.Rep.No. 97-153, supra, at 153.
While § 702 alone could not assure profitability for Conrail, Congress reasonably expected it to make a significant contribution to achieving that goal. Annual savings are estimated at $70 million, for which the Government was willing to supply an estimated $115 million in termination allowances.[14] As against this, achievement of the same reduction in force under existing agreements would require twice as many terminations and produce savings of only $9 million.[15]
Our analysis of the due process contentions must begin by recognizing that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States." Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). However, Congress has greater freedom to deal with private contractual rights than with obligations of the Federal Government. Contrast Norman v. Baltimore & Ohio R. R., 294 U.S. 240, 306, 55 S.Ct. 407, 415, 79 L.Ed. 885 (1935), with Perry v. United States, 294 U.S. 330, 348, 350-51, 55 S.Ct. 432, 434, 435, 79 L.Ed. 912 (1935). As the Court stated in Norman, 294 U.S. at 307-08, 55 S.Ct. at 415-16:
Contracts, however express, cannot fetter the constitutional authority of the Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of the Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.
The principle thus stated in Norman had been settled long before. Louisville & N. R. R. Co. v. Mottley (II), 219 U.S. 467, 482, 31 S.Ct. 265, 270, 55 L.Ed. 297 (1911), upheld the invalidation, by the 1906 amendments to the Interstate Commerce Act of 1887, of a contract settling personal injury claims of *707 Mr. and Mrs. Mottley for passes during their respective lives. A unanimous Court, speaking through the first Justice Harlan, said:
That the exercise of [the commerce] power may be hampered or restricted to any extent by contracts previously made between individuals or corporations, is inconceivable. The framers of the Constitution never intended any such state of things to exist.
See also id. at 485-86, 31 S.Ct. at 271. Relying on the Mottley decision, the Court in Philadelphia, Baltimore & Washington R. R. v. Schubert, 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911 (1912), upheld the constitutionality of § 5 of the Federal Employers' Liability Act, 35 Stat. 65, which declared void any contract enabling a carrier to exempt itself from liability under the Act. The Court said through Justice Hughes, id. at 613-14, 32 S.Ct. at 592:
The power of Congress, in its regulation of interstate commerce, and of commerce in the District of Columbia and in the Territories, to impose this liability, was not fettered by the necessity of maintaining existing arrangements and stipulations which would conflict with the execution of its policy. To subordinate the exercise of the Federal authority to the continuing operation of previous contracts, would be to place, to this extent, the regulation of interstate commerce in the hands of private individuals and to withdraw from the control of Congress so much of the field as they might choose by prophetic discernment to bring within the range of their agreements. The Constitution recognizes no such limitation. It is of the essence of the delegated power of regulation that, within its sphere, Congress should be able to establish uniform rules, immediately obligatory, which as to future action should transcend all inconsistent provisions. Prior arrangements were necessarily subject to this paramount authority.
Again, in Fleming v. Rhodes, 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 (1947), the Court said:
So long as the Constitution authorizes the subsequently enacted legislation, the fact that its provisions limit or interfere with previously acquired rights does not condemn it.
More recently, the Court, in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), although indicating its inability "to develop any `set formula' for determining when" compensation is required under the taking clause, identified several factors that have had particular significance in its decisions on the question. A number of considerations highlighted therein reinforce our conclusion that § 702 does not effect a taking for which compensation is constitutionally required. One is that "[a] `taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Id. at 124, 98 S.Ct. at 2659 (citation omitted). Another is that "`Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.... [T]his Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole ...." Id. at 130-31, 98 S.Ct. at 2662. Here, as we have pointed out, § 702 by no means abrogates all rights under the pertinent agreements. Section 702(d) offers the options of a severance allowance, voluntary furlough, or the exercise of seniority at another location. Section 702(e) merely decreases the total number of jobs available on the system and thus increases the likelihood that at any given time particular employees, predominantly those with low seniority, will be on furlough and decreases the wages of employees working in less desirable positions. A third consideration is the Court's statement:
Legislation designed to promote the general welfare commonly burdens some more than others. The owners of the *708 brickyard in Hadacheck [v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915)], of the cedar trees in Miller v. Schoene, [276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928),] and of the gravel and sand mine in Goldblatt v. Hempstead, [369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962),] were uniquely burdened by the legislation sustained in those cases. Similarly, zoning laws often affect some property owners more severely than others, but have not been held to be invalid on that account.
Penn Central, 438 U.S. at 133-34, 98 S.Ct. at 2664 (footnote omitted). This is useful in answering the claim that Congress' action rises to the level of a taking because affected workers bear a disproportionate share of the burden of Congress' scheme to preserve rail service in the Northeast and Midwest. In contrast to the Penn Central decision, in Kaiser Aetna v. United States, 444 U.S. 164, 179-80, 100 S.Ct. 383, 392-93, 62 L.Ed.2d 332 (1979), where the Court concluded that a taking had occurred because the federal government's action extinguished the land-owner's right to exclude, which is "so universally held to be a fundamental element of the property right", the Court was careful to note that "the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina.... And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation." Id. (citations omitted).
As stated in Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976), the Court has long "upheld against due process attack the competence of Congress to allocate the interlocking economic rights and duties of employers and employees ... regardless of contravening arrangements between employer and employee." Likewise, the Court has held that legislation "readjusting rights and burdens" between employers and employees "is not unlawful solely because it upsets otherwise settled expectations." Id. at 16, 96 S.Ct. at 2893. The statement applies here a fortiori. Railway labor could hardly have had "settled expectations" that Congress would forever refrain from doing away with jobs which a presidential commission had found to be useless twenty years ago and which the unions, in their collective bargaining agreements, had in effect conceded to be. As the Supreme Court has articulated the broad contours of Congress' power under the Commerce Clause, it has become ever more clear that private arrangements will not be permitted to stand in the way. If we assume there are some limits beyond which Congressional action may not go, certainly these were not exceeded here.
The equal protection arguments can be disposed of even more readily. Application of the equal protection concept to invalidate economic regulation is quite restricted. In the absence of the existence of "fundamental rights" or invidious discrimination, neither of which is present here, "[i]t is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." Williamson v. Lee Optical Co., 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). "[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines ...." New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976), citing Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952).
The attack on the $25,000 ceiling is that it is irrational to apply the same maximum to an older worker with only a few years of expectable service and to a younger worker who might have anticipated many years of employment.[16] In fact, however, the younger worker's expectations are *709 dependent on the success of the enterprise. If Conrail's traffic continues to decline or if it should be sold, particularly if it should be sold piecemeal, seniority rights might make the older worker's future longer than the younger's. In addition, a uniform ceiling is responsive to the fact that younger workers who are separated presumably are in a better position to find alternative employment. Congress was not required to fine tune the maximum separation allowance to the unpredictable merits of each individual case.
In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369.
Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). See also United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 175-79, 101 S.Ct. 453, 459-61, 66 L.Ed.2d 368 (1980). The desire to provide a simple, workable maximum on termination allowances is reason enough.
The equal protection argument based on the fact that § 702 applies only to Conrail is also unavailing. No other railroad is similarly situated. Conrail had received subsidies from the federal government in excess of $5 billion. In NRSA itself Congress extended further subordination of the $3.3 billion in federal debt to encourage the sale of Conrail stock, § 402 of the RRR Act added by § 1142 of NRSA; authorized an additional $262 million for the purchase of Conrail securities, § 217 of the RRR Act added by § 1140(a) of NRSA; and provided a federally funded labor protection program, §§ 1143 and 1144 of NRSA. Congress determined that in order to justify these expenditures Conrail must be freed from the provisions of the Fireman Manning and Crew Consist Agreements which had prevented its realizing essential savings by abolishing unneeded positions. The notion of equal protection embodied in the Fifth Amendment does not hobble Congress to the choices of doing this for all railroads or for none. "[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.... The legislature may select one phase of the field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." Williamson v. Lee Optical Co., supra, 348 U.S. at 489, 75 S.Ct. at 465 (citations omitted). See also New Orleans v. Dukes, supra, 427 U.S. at 306, 96 S.Ct. at 2518, overruling Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957).

4. Constitutionality: The Bankruptcy Clause

At argument counsel for three UTU local chairmen who are defendants in No. 82-7 contended, on the authority of the Supreme Court's recent decision in Railway Labor Executives' Ass'n v. Gibbons, ___ U.S. ___, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982), that because § 702 applies only to Conrail, it violates Article I, § 8, clause 4 of the Constitution empowering Congress to "establish ... uniform Laws on the subject of Bankruptcies throughout the United States." On its face § 702, regulating the employment relations of a non-bankrupt carrier has nothing to do with bankruptcy, the "subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief." Wright v. Union Central Ins. Co., 304 U.S. 502, 513-14, 58 S.Ct. 1025, 1031-32, 82 L.Ed. 1490 (1938). The constitutional support for § 702, as indicated by the findings in § 1132, especially § 1132(3), and the recitals of purposes in § 1133 of NRSA, is the commerce power, not the bankruptcy power.
The chairmen's argument rests solely on the fact that § 702 is a part of Title VII which § 1143(a) of NRSA added to the RRR Act of 1973 as amended. The decision *710 of Congress, simply as a matter of convenient reference, to tack Title VII, which has none of the characteristics of bankruptcy legislation, onto the RRR Act did not implicate the constitutional requirement of uniformity.

5. Injunctive Relief

Having concluded that Congress intended § 702 to operate without regard to the Fireman Manning Agreement and the Crew Consist Agreement and that the section as so construed is not unconstitutional, and that Conrail has thus proceeded lawfully in implementing those provisions, we must consider whether to make permanent the preliminary injunction previously issued in No. 82-7 as Conrail urges.
We have no doubt that the issue presented in No. 82-7 is a "labor dispute" within § 13(c) of the Norris-LaGuardia Act, 29 U.S.C. § 113(c). It is also plain that § 4 of that Act, 29 U.S.C. § 104, would prohibit us from issuing the injunction if the Norris-LaGuardia Act is applicable to our functioning under § 1152 of NRSA.
We think it is not. Section 1152(a) provides that:
Notwithstanding any other provision of law, the special court shall have original and exclusive jurisdiction over any civil action  (1) for injunctive, declaratory, or other relief relating to the enforcement, operation, execution, or interpretation of any provision or amendment made by this subtitle ....
It is true that this does not speak with the pristine clarity of § 10(h) of the National Labor Relations Act, 29 U.S.C. § 160(h), see Bakery Sales Drivers Local Union No. 33 v. Wagshal, 333 U.S. 437, 442, 68 S.Ct. 630, 632, 92 L.Ed. 792 (1948); Building and Construction Trades Council v. Alpert, 302 F.2d 594 (1 Cir. 1962). The failure of Congress to make specific mention of the Norris-LaGuardia Act in the "notwithstanding" provision of § 1152(a) could well have been due to the fact that it wished as well to exclude the application of other laws, e.g., the provision of 28 U.S.C. § 1331 vesting the district courts with jurisdiction over cases arising under laws of the United States. Its omission of express reference is no reason for failing to read its general words as meaning what they unmistakably say. Here, as in the case of "minor disputes" under the Railway Labor Act, 45 U.S.C. § 151 et seq., there must be an accommodation between the two statutes with the balance favoring the later and more limited one. Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 563, 57 S.Ct. 592, 606, 81 L.Ed. 789 (1937); Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30, 39-40, 77 S.Ct. 635, 639-640, 1 L.Ed.2d 622 (1957); Chicago & N. W. Ry. Co. v. United Transportation Union, 402 U.S. 570, 582-83 n.18, 91 S.Ct. 1731, 1737-38 n.18, 29 L.Ed.2d 187 (1971). The recital of the "public policy of the United States" in § 2 of the Norris-LaGuardia Act, 29 U.S.C. § 102,[17] by which the courts are directed to be guided in interpreting the act and determining their jurisdiction and authority, shows how far removed the purpose of that *711 statute is from a case where Congress itself has set labor policy for a single railroad with respect to a particular labor problem and vested a special court of three judges with authority to enforce the Congressional decision by granting injunctive relief. Compare Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 250-53, 90 S.Ct. 1583, 1592-93, 26 L.Ed.2d 199 (1970).
Although we thus conclude that the Norris-LaGuardia Act does not bar the injunction sought by Conrail, an injunction should not issue unless there is "some cognizable danger of recurrent violation". United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). When the preliminary injunction was issued in No. 82-7, such a danger plainly existed. Conrail's complaint alleged (Appendix B) that UTU's president had authorized subordinate UTU general committees to conduct strike votes in connection with Conrail's implementation of § 702; that certain such committees had conducted such votes; and that they and certain UTU local officers had informed Conrail and the general public that a work stoppage would be conducted. Employees would report to work on February 22, 1982, and ascertain the crew or work assignments which they had received. If a crew was scheduled to operate with a position blanked under the § 702 program, it would refuse to work; if Conrail disciplined an employee for such refusal, a general strike would ensue. The Affidavits of Conrail's Vice-President  Labor Relations, R.E. Swert, and other Conrail officials in support of its motion for a temporary restraining order elaborated upon this and on the serious harm which a strike would cause to Conrail and to the country. Counsel for UTU did not challenge Conrail's allegations. Indeed UTU later stipulated that certain UTU general committees had voted to take strike action against Conrail in support of UTU's view that § 702 did not supersede existing agreements; that UTU was prepared to grant strike authority to such committees unless enjoined by this court; and that if such authority was issued some Conrail employees represented by UTU would strike.
Before this court the defendants in No. 82-7 have contended that there will be no need for an injunction once we decide the legal issues. The brief for UTU states (p. 12):
Nevertheless, if this Court rules against the UTU or any appropriate appeals decision is against the UTU, the UTU would not sanction a strike. Thus, the determination of the underlying dispute will, we believe, moot the Norris-LaGuardia Act issue.
Counsel for UTU said at argument:
If you determine it against us, I think I indicated in our pleadings, in our brief to the Court, that the union is not going to defy the Court and order a strike in violation of the Court's ruling.
Transcript at 10; see also id. at 11. Counsel for local chairmen, Casey, Connors and Maloof, who had expressed the greatest opposition to Conrail's actions, stated:
If you rule [against us] ... then they won't have a right under Section 6 to go on strike.... As far as I know, they won't. But they have been completely law-abiding up until this point, and there is no reason for the Court to believe that they would not continue to be so.
Transcript at 49-50. Counsel for Local 1418 who spoke briefly was not asked about this question and did not address it.
In view of these unequivocal representations, which we expect to be fulfilled, we cannot find that the threat of a strike is now so real or imminent as to warrant a permanent injunction. It is important, however, not only that there should be no strike that would directly frustrate the will of Congress, but also that shippers should perceive Conrail as being as free as possible from the likelihood of such a strike. Otherwise the efforts of Congress to enable Conrail to achieve profitability might be seriously jeopardized. We therefore think it desirable to alert the parties to our present inclination, in the event that an illegal strike should be actually threatened, to issue immediately a temporary restraining order and then to provide Conrail with other *712 appropriate relief. At this point counsel have not suggested what new arguments could be made, in the event of renewed threat of a strike, that would lead us to deny a temporary restraining order or a preliminary injunction. Our decision should thus not be taken to reflect on the appropriateness of injunctive relief when and if a proper showing has been made that a strike is likely  an event we trust will not occur. We hold only that at the present time a permanent injunction is not appropriate.
Judgment will be entered in Nos. 82-4 and 82-7 declaring that § 702 added to the RRR Act by § 1143(a) of NRSA confers authority on Conrail to take the actions there specified without regard to the Manning Agreement, the Crew Consist Agreement or any other collective bargaining agreement. Judgment will be entered in No. 82-7 vacating the injunction entered on February 22, 1982, and denying Conrail's motion for a permanent injunction. Judgment will be entered in No. 82-2 rejecting all constitutional challenges to § 702. If Conrail desires a more detailed form of judgment, it may submit one for settlement on five days' notice.
NOTES
[1] 702(a) GENERAL.The Corporation may terminate the employment of certain employees, in accordance with this section, upon the payment of an allowance of $350 for each month of active service with the Corporation or with a railroad in reorganization, but in no event may any such termination allowance exceed $25,000.
(b) EMPLOYMENT NEEDS.Within 90 days after the effective date of this title, the Corporation shall determine, for each location, the number of employees that the Corporation intends to separate under subsection (a) of this section.
(c) NOTIFICATION AND SEPARATION PROCEDURE.(1) Within 90 days after the effective date of this title, the Corporation shall notify its employees of their rights and responsibilities under this section.
(2) Within 90 days after the effective date of this title, the Corporation shall notify each train and engine service employee eligible to be separated under paragraph (3) that such employee may be entitled to receive a separation payment under this section if such employee files a written request to be separated. Such notice may be revised from time to time.
(3) If the number of employees who request to be separated pursuant to paragraph (2) of this subsection is greater, in engine service at any location, than the number of excess firemen at the location, and in train service at the location than the number of excess second and third brakemen, as determined by the Corporation, the Corporation shall separate the employees described in paragraph (2) of this subsection in order of seniority beginning with the most senior employee, until the excess firemen and second and third brakemen positions at that location, as determined by the Corporation, have been eliminated.
(d) DESIGNATED SEPARATIONS.If the number of employees who are separated pursuant to subsection (c)(3) is less at any location than the number of excess firemen in freight and commuter service and second and third brakemen in freight service at such location, as determined by the Corporation, the corporation may, after 210 days after the effective date of this title, designate for separation employees in engine service or train service respectively in inverse order of seniority, beginning with the most junior employee in active service at such location until the excess firemen in freight and commuter service and second and third brakemen in freight service, at that location have been eliminated. An employee designated under this subsection may choose (1) to furlough himself voluntarily, in which case the next most junior employee protected under the fireman manning or crew consist agreements or any other agreement or law, in the same craft or class at such location may be separated instead and receive the separation allowance, or (2) to exercise his seniority to another location, in which case the Corporation may separate, under the provisions of this subsection, the next most junior protected employee in active service at the location to which seniority ultimately is exercised.
(e) EFFECT ON POSITIONS.(1) The Corporation shall refrain from filling one fireman position in freight service, or in commuter service where applicable, for each employee in engine service separated in accordance with this section.
(2) The Corporation may refrain from filling one brakeman position in excess of one conductor and one brakeman on one crew in freight service for each employee in train service who is separated in accordance with this section.
(3) Positions permitted to be not filled under this subsection shall be not filled in different types of freight service actually operated at or from the location in a sequence to be agreed upon between the Corporation and the general chairman representative of classes or crafts of employees having jurisdiction over the positions to be not filled. If no such agreement is reached, the Corporation may designate the position to be not filled.
(4) Notwithstanding paragraphs (1) and (2) of this subsection, the Corporation shall retain all rights it has under any provision of law or agreement to refrain from filling any position of employment.
(f) PROCEDURES.The Corporation and representatives of the various classes and crafts of employees to be separated may agree on procedures to implement this section, but the absence of such agreement shall not interfere with implementation of the separations authorized by this section.
(g) COMMUTER EMPLOYEES.The provisions of this section shall apply to the separation of firemen in commuter service, except that with respect to such employees the Corporation is required to make the separations authorized by this section.
Section 713 authorized $385,000,000 to be appropriated to carry out the provisions of Title VII, entitled "Protection of Employees", of which § 702 formed a part. Not more than $115,000,000 was to be available solely for termination allowances under § 702. Assuming that all terminated employees would qualify for the $25,000 maximum permitted by § 702(a), the $115,000,000 would provide for 4600 terminations.
[2] Explanatory Statement of the House and Senate Conferees with Respect to Subtitles E, F, and G of Title XI of the Omnibus Reconciliation Bill (H.R. 3982) [hereafter Explanatory Statement], 127 Cong.Rec.S. 9056, 9060-61 (daily ed. July 31, 1981); Northeast Rail Service Act of 1981, Hearing before the Subcommittee on Surface Transportation of the Committee on Commerce, Science, and Transportation, United States Senate, 97th Cong., 1st Sess. [hereafter Senate Hearing II] 38, 41-43 (1981) (Comments of James E. Burke, Vice President, United Transportation Union).
[3] The Commission recommended that the parties agree to eliminate the unnecessary positions through attrition, with job protection extended to present employees; the carriers accepted this proposal but the unions rejected it.
[4] Arbitration Board No. 282 found the fireman position obsolete and authorized the elimination of all firemen positions subject to restoration of up to 10% by union officers for engineer training purposes. It remanded the train service crew consist dispute back to the carriers and unions for local arbitration. This resulted in eliminating some second brakemen positions but full implementation was impaired by state full crew laws.
[5] See, e.g., Conrail, Options for Conrail, Conrail's Response to Section 703(c) of the Staggers Rail Act of 1980, at 8-7, 8-A-7 (April 1, 1981); USRA, Conrail at the Crossroads: The Future of Rail Service in the Northeast, at 10 (April 1981); United States Department of Transportation, Federal Railroad Administration, Recommendations for Northeast Rail Service, at C-2 to C-3 (1981).
[6] USRA, Cost and Productivity  Train and Engine Service, Conrail vs. Selected Other Carriers  1980, at 15-43 (1981); Report by the Comptroller General of the United States, Conrail's Attempts to Control Labor Costs and Improve Its Labor Productivity (1980).
[7] See authorities cited in note 5 supra.
[8] See Exhibits I, J, and K to Affidavit of R. E. Swert, March 4, 1982.
[9] A third element was "protection of Conrail against new labor cost obligations resulting from statutory employee protection requirements or from collective bargaining or transfer of function or lines to others without the transfer of involved employees." Conrail, Labor Report to Congress: Response to Staggers Act Section 703(c), at 2 (March 15, 1981).
[10] Vice President Burke of UTU has submitted an affidavit denying that he or other union representatives agreed that UTU-Conrail agreements were superseded by Congressional legislation. He does not deny Swert's assertion that the proposal was jointly submitted and that Conrail understood it would supersede existing agreements. Review of documents submitted by Conrail, notably a letter from President Hardin of UTU to General Chairman Doar dated December 8, 1981, indicates to our mind UTU's then understanding that § 702 superseded pro tanto the Fireman Manning Agreement and the Crew Consist Agreement. However, we do not rest our decision on this in any degree.
[11] § 711. No State may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation, the National Railroad Passenger Corporation, or the Amtrak Commuter Services Corporation to employ any specified number of persons to perform any particular task, function, or operations, or requiring the Corporation to pay protective benefits to employees, and no State in the Region may adopt or continue in force any such law, regulation, order, or standard with respect to any railroad in the Region.
[12] Fred J. Kroll, Chairman of the Railway Labor Executives' Association, testified that a sale of Conrail's lines to other operators would result in the loss of more than 40,000 jobs, over half of Conrail's freight employment. Consolidated Rail Corporation, Hearings before the Subcommittee on Commerce, Transportation, and Tourism of the Committee on Energy and Commerce, House of Representatives, 97th Cong., 1st Sess., at 486-87 (1981); Conrail Reauthorization, Hearings before the Subcommittee on Surface Transportation of the Committee on Commerce, Science, and Transportation, United States Senate, 97th Cong., 1st Sess., at 63, 66, 68 (1981).
[13] The Supreme Court has characterized the Railway Labor Act's procedures regarding major disputes as "an almost interminable process," Detroit & Toledo Shore Line R. R. v. United Transportation Union, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969).
[14] This assumes that each terminated employee will receive the maximum of $25,000. See Affidavit of R. E. Lindquist in support of Conrail's motion for summary judgment in Nos. 82-4 and 82-7, March 9, 1982.
[15] Id.
[16] The $25,000 maximum, of course, has no effect on employees with less than six years of qualified service.
[17] 102. Public Policy in labor matters declared
In the interpretation of this chapter and in determining the jurisdiction and authority of the courts of the United States, as such jurisdiction and authority are defined and limited in this chapter, the public policy of the United States is declared as follows:
Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted.
29 U.S.C. § 102.