582 F.Supp. 1546 (1984)
Robert W. KEELER, et al., Plaintiffs,
v.
CONSOLIDATED RAIL CORPORATION, Defendant,
and
National Railroad Passenger Corporation and United States of America, Defendant-Intervenors.
Civ. A. No. 82-3.
Special Court, Regional Rail Reorganization Act.
March 29, 1984.
*1547 *1548 Nelson G. Grills, Indianapolis, Ind., for plaintiffs Keeler, et al.
Thomas E. Reinert, Jr., Harry A. Rissetto, Morgan Lewis & Bockius, Washington, D.C. (Dennis Alan Arouca, Consol. Rail Corp., Philadelphia, Pa., of counsel), for defendant Consol. Rail Corp.
Christopher Klein, C. Ann Courtney, Nat. Railroad Passenger Corp., Washington, D.C., for defendant-intervenor Nat. Railroad Passenger Corp.
C. Max Vassanelli, Robert S. Lavet, Dennis G. Linder, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendant-intervenor U.S. of America.
Before GASCH, Presiding Judge, and BRYANT and WEINER, Judges.

MEMORANDUM OPINION
BRYANT, Judge.
Plaintiffs seek a judgment declaring certain provisions of the Northeast Rail Service Act of 1981 (NRSA) unconstitutional, enjoining the defendant Conrail from further "implementing the terms of the [allegedly] unconstitutional portions" of NRSA and awarding damages for losses of income resulting from implementation of the allegedly unconstitutional provisions.
The matter is before the court on the parties' cross-motions for summary judgment. The plaintiffs contend that NRSA was not intended to preempt an Indiana statute which affects their employment; and that if it was so intended, it violates the fifth, ninth, tenth, and thirteenth amendments. Defendant Conrail and the defendant-intervenors argue that Congress specifically intended to preempt state minimum crew laws, including Indiana's, and that Congress validly exercised its power. For the reasons stated below, the court grants summary judgment for the defendants.

I. Background

The Indiana Minimum Crew Law of 1937 provided for minimum crews on trains operating in Indiana according to the size and type of train. A passenger train, for example, was to be manned by a fireman, conductor, and flagman if the train had four cars, with a brakeman required on longer trains. A freight train required a fireman, conductor, flagman, and brakeman, plus a second brakeman on trains of 70 cars or more. Ind.Code Ann. §§ 8-9-2-28-9-2-4 (Burns 1973).
In 1972 the Indiana statute was amended to permit exceptions to the minimum crew requirements. Under the amendment, the Indiana Public Service Commission (PSC) approved the use of smaller crews as provided for in collective bargaining agreements, if the crew size was "adequate for safety of operation" and employees with seniority as of February 16, 1972 were guaranteed continued employment. Id. § 8-9-2-10.
The PSC approved two agreements of relevance here: the Fireman Manning Agreement of 1972 and the Crew Consist Agreement of 1978.[1] The Fireman Manning Agreement required Conrail to employ firemen on passenger trains, giving preference to employees with seniority as of the agreement date, and to employ firemen on freight trains to the extent that senior firemen remained available after passenger service positions were filled.[2] The Crew Consist Agreement similarly provided for the use of brakemen: brakeman positions were to be filled according to seniority, with second and third brakeman slots to be filled if senior brakemen lay claim to them.[3] These agreements, in short, reduced train crews, but only where the employment needs of senior firemen and brakemen had already been accommodated.
*1549 When Congress passed NRSA it perceived the employment of excess firemen and brakemen as a major source of Conrail's continuing financial inviability. See United Transportation Union v. Consolidated Rail Corp. ("Cannon"), 535 F.Supp. 697, 704-05, cert. denied, 457 U.S. 1133, 102 S.Ct. 2969, 73 L.Ed.2d 1350 (1982). Accordingly § 702 permits Conrail to terminate excess firemen and brakemen upon payment of a cash allowance; open fireman positions which result must be eliminated, and open second brakeman positions which result may be eliminated at Conrail's discretion. 45 U.S.C. § 797a.
Conrail and the National Railroad Passenger Corporation (Amtrak), which contracts out its passenger operations in Indiana to Conrail,[4] have begun to implement § 702 without seeking PSC approval.[5] The steps they have taken include unilateral elimination of positions and an agreement with the United Transportation Union to reduce crews on certain maintenance and freight operations.[6] Conrail expects to eliminate 600 positions in Indiana, at a savings of $15.1 million in labor costs; its systemwide goal is to reduce the prevailing crew size to one conductor and one brakeman, retaining fireman positions solely to fulfill training and seasonal employment demands.[7] The plaintiffs, to whom the seniority provisions of the Indiana statute apply,[8] assert that implementation of § 702 is barred by the Indiana statute.
The defendants claim that the Indiana Minimum Crew Law was preempted by § 1168(b) of NRSA, which reads as follows:
The operation of trains by Conrail shall not be subject to the requirement of any State or local law which specifies the minimum number of crew members which must be employed in connection with the operation of such trains. [45 U.S.C. § 1116(b).]
In addition, the defendants rely on § 711 of the Regional Rail Reorganization Act of 1973 (the 3R Act) as amended by NRSA:
No State may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation, the National Railroad Passenger Corporation, or the Amtrak Commuter Services Corporation to employ any specified number of persons to perform any particular task, function, or operation, or requiring the Corporation to pay protective benefits to employees, and no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region. [45 U.S.C. § 797j.]
In an unrelated matter the PSC recently held that this section indeed preempts the Indiana Full Crew Law.[9]

II. Discussion

The initial question in deciding whether a federal statute preempts a state statute is whether Congress intended preemption. Shaw v. Delta Air Lines, Inc., ___ U.S. ___, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983). In this case, Congress' intent to preempt certain state statutes is express. Moreover, the Indiana statute fits squarely within the descriptions of the statutes affected. Section 711 refers to state laws which require the use of "any specified number of persons to perform any particular task, function, or operations". The Indiana statute, which states minimum crew sizes required for the operation of any train or locomotive, is just such a law. The Indiana PSC may approve crew sizes below the statutory minimum for individual railroads, but in such cases those railroads are held to minimum crew sizes by regulatory decree rather than by statute  an insignificant distinction under the *1550 express terms of § 711. Likewise, the Indiana statute and the rulings of the PSC thereunder "specif[y] the minimum number of crew members which must be employed in connection with the operation of [trains by Conrail]" within § 1168(b). Any doubt that Congress intended to preempt all state minimum crew laws is dispelled by the legislative history of NRSA, including the following passage in the House Report on a predecessor bill:
Section 711 preempts any State law, rule, or regulation requiring Conrail, Amtrak, or their commuter subsidiaries to hire specified numbers of persons for particular tasks. The Committee specifically intends to preempt any State full crew laws which require crews to contain certain numbers or certain positions, and any State laws which phase out such requirements. Given the dire circumstances of these rail transportation corporations, such a preemption is necessary. [H.Rep. No. 153, 97th Cong., 1st Sess. 30 (1981) (reporting H.R. 3559, Rail Service Improvement Act of 1981).]
Congress plainly intended to insure that neither collective bargaining agreements nor state minimum crew laws would stand in the way of the NRSA workforce scheme. See Cannon, 535 F.Supp. at 704.
The plaintiffs' chief argument that Congress did not intend to preempt the Indiana Minimum Crew Law is that the Indiana law was a safety measure, whereas NRSA addressed economic issues only. But on its face the Indiana statute is not solely concerned with safety. Under § 8-9-2-10 the Indiana PSC may not approve the use of smaller crews unless the jobs of senior employees are protected, even where the smaller crews are "adequate for safety of operations." PSC approval, in other words, is contingent on findings relating to safety and employment protection.
More important, whatever the purposes of the Indiana statute, Congress evidently saw no legitimate safety reasons for Conrail to employ the numbers of firemen and brakemen required under Indiana law. Congress specifically intended to permit Conrail to eliminate 4600 fireman and brakeman positions, S.Rep. No. 139, 97th Cong., 1st Sess. 331 (1981), U.S.Code Cong. & Admin.News 1981, p. 396; it is pursuant to this goal that Conrail is acting in Indiana, see Lindquist Affidavit, ¶ 3. Congress was aware of studies indicating that elimination of positions on that scale would not create safety risks.[10] Union representatives, moreover, pressed job security rather than safety concerns at the legislative subcommittee hearings.[11] In short, Congress enacted § 702 with the full expectation that Conrail would do exactly what it is doing in Indiana, without reason to believe that a safety hazard would ensue, and with ample reason to believe that safety was not threatened at all. Against this background it is simply implausible that §§ 1168(b) and 711 contemplate an exception for Indiana on the ground that the Indiana legislature of 1937 enacted its minimum crew law "to promote the safety of employees and of travelers upon railroads," 1937 Ind.Acts Ch. 58, Sec. 1 (title of Act).
Sections 1168(b) and 711, then, were intended to preempt the Indiana Minimum Crew Law. The constitutional question is whether those sections are valid exercises of the commerce power, to be given effect under the Supremacy Clause. The general rule is that the commerce power is "a grant of plenary authority to Congress ... `acknowledg[ing] no limitations, other than *1551 are prescribed in the constitution.'" Hodel v. Virginia Surface Mining & Reclamation Association, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (quoting Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23 (1824)). The plaintiffs allege that "limitations ... prescribed in the constitution" are present in this case. First, the plaintiffs argue that preemption of the Indiana law violates "fundamental personal rights" protected by the ninth amendment, quoting Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring). But courts have been reluctant to find support in the ninth amendment for "fundamental personal rights" beyond the right of privacy. See, e.g., Township of Long Beach v. City of New York, 445 F.Supp. 1203, 1212 (D.N.J.1978); Gasper v. Louisiana Stadium and Exposition District, 418 F.Supp. 716, 721-22 (D.La.1976), aff'd, 577 F.2d 897 (5th Cir.1978). Moreover, there is no authority for the proposition that the right to a safe workplace was one of the rights "retained by the people" at the time of the Bill of Rights. The ninth amendment claim therefore must be rejected.
The plaintiffs' tenth amendment challenge too is without merit. The plaintiffs concede that National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), does not support their position.[12] The tenth amendment test is thus a lenient one: whether the means Congress selected was "reasonably related to the goal of regulating interstate commerce." Hodel, 452 U.S. at 291, 101 S.Ct. at 2368. The preemption provisions of NRSA and the 3R Act are clearly reasonably related to the goal of making Conrail and northeastern rail service viable. The fact that certain exercises of state police power may be preempted does not change this conclusion. Id. Similarly, the plaintiffs' due process challenge fails because the plaintiffs have not met their burden of showing that "the legislature has acted in an arbitrary and irrational way." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).
Finally, the plaintiffs contend that preemption of the Indiana statute subjects them to involuntary servitude in violation of the thirteenth amendment. Their argument is based in part on § 708(c) of the 3R Act as amended by NRSA, which prohibits employee initiation of procedures "for the purpose of negotiating job stabilization or other protective agreements with [Conrail] until after April 1, 1984." 45 U.S.C. § 797g(c). This provision and the preemption of Indiana law, the plaintiffs claim, combine to leave them without redress in the event of unsafe working conditions.[13] But if the plaintiffs do become exposed to safety hazards they have remedies under the Federal Railroad Safety Act of 1970, 45 U.S.C. § 421 et seq. In particular, they may sue the Secretary of Transportation for issuance of an emergency order if they "may be exposed to imminent physical injury" and she has failed to act, 45 U.S.C. § 432(e). More important, the plaintiffs have not shown that they are compelled to work: i.e., that there is "no way to avoid continued service or confinement," United States v. Shackney, 333 F.2d 475, 486 (2d Cir.1964). On that basis alone there is no involuntary servitude in this case.

Conclusion
In cases where federal and state statutes "cannot `move freely within the orbits of their respective purposes without impinging on one another,'" the federal statute ordinarily must prevail under the Supremacy Clause. Hill v. Florida, 325 U.S. 538, 543, 65 S.Ct. 1373, 1375, 89 L.Ed. 1782 (1945) (quoting Union Brokerage Co. v. Jensen, 322 U.S. 202, 207, 64 S.Ct. 967, 971, 88 L.Ed. 1227 (1944)). This is such a case; summary judgment therefore is awarded to the defendants.
NOTES
[1] Joint Exhibits 13, 15.
[2] Stipulation of Facts ¶ 11; Joint Exhibit 2.
[3] Stipulation of Facts ¶ 16; Joint Exhibit 3.
[4] Stipulation of Facts ¶ 4; Joint Exhibit 1.
[5] Stipulation of Facts ¶ 25.
[6] Joint Exhibits 6-7, 9-10.
[7] Lindquist Affidavit ¶ 5; Memorandum in Support of Conrail's Cross-Motion for Summary Judgment at 5.
[8] Stipulation of Facts ¶¶ 5-9.
[9] In re Illinois Cent. Gulf R.R. Co., No. 36868 (Ind.P.S.C. Nov. 23, 1983). This, of course, does not moot the question before this court. See 45 U.S.C. § 1105(a) (Special Court has "original and exclusive jurisdiction").
[10] See Northeast Rail Service Act of 1981: Hearing on S. 1100 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science, and Transportation, 97th Cong., 1st Sess. 81-82 (1981) (Report of Northeast Corridor Commuter Rail Authorities on Conrail Labor Issues) (citing GAO and Transportation Department reports).
[11] See Consolidated Rail Corporation: Hearings Before the Subcomm. on Commerce, Transportation, and Tourism of the House Comm. on Energy and Commerce, 97th Cong., 1st Sess. 486-544 (1981); Conrail Reauthorization: Hearings Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science, and Transportation, 97th Cong., 1st Sess. 43-80 (1981); Northeast Rail Service Act of 1981: Hearing on S. 1100 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science, and Transportation, 97th Cong., 1st Sess. 34-44 (1981).
[12] Brief of the Plaintiffs in Reply to the Defendants' Briefs in Support of their Motion for Summary Judgment 13-14.
[13] The plaintiffs maintain that a strike would be illegal, relying on Chicago B. & Q.R.R. v. Railway Empl. Dept., 301 F.Supp. 603, 609 (D.D.C. 1969). We assume arguendo that this is correct.