**UNITED TRANSPORTATION UNION and Brotherhood of Railway Carmen of the United States and Canada**

v.

**CONSOLIDATED RAIL CORPORATION.**

**Civ. A. No. 83–3.**

Special Court,
Regional Rail Reorganization Act.

Aug. 30, 1984.

James L. Highsaw, Highsaw & Mahoney, P.C., Washington, D.C., for plaintiffs United Transportation Union and Brotherhood of Railway Carmen of the United States of America and Canada.

David S. Fortney, Philadelphia, Pa., for defendant Consolidated Rail Corporation.

## MEMORANDUM OPINION

WEINER, Judge.

Plaintiffs seek a judgment declaring Section 714 of the Regional Rail Reorganization Act of 1973 (the "3R Act"), added by Section 1143(a) of the Northeast Rail Service Act of 1981 ("NRSA"), 45 U.S.C. § 797m, as the exclusive remedy for disputes arising under Sections 701, 702, 705, 706, 707, and 709 of Title VII of the 3R Act involving the interpretation, application, or enforcement of these sections. Plaintiffs also seek an injunction directing Conrail to join with the plaintiffs in setting up arbitration panels pursuant to the provisions of Section 714.

This matter is before the court on the parties' cross-motions for summary judgment. The plaintiffs contend that disputes arising under the Title VII sections enumerated above require arbitration under Section 714. The defendant contends that Section 714 provides for an exception to arbitration which requires this court to resolve Title VII disputes. For the reasons which follow, the court grants summary judgment for the plaintiffs.

## BACKGROUND

Under Section 702 of the 3R Act, as added by the NRSA, Conrail is authorized to separate (terminate) train and engine service employees and permanently abolish (or "blank") a corresponding number of positions.[1] Conrail determines the necessary number of positions which must be blanked at each location.[2] A dispute exists between the United Transportation Union ("UTU") and Conrail regarding the operation and interpretation of Section 702(e)(2) which authorizes Conrail to blank "... one brakeman position in excess of one conductor and one brakeman on one crew in freight service for each employee in train service who is separated in accordance with [Section 702]." The UTU and Conrail have not entered into any agreement, as authorized by Section 702(f), relating to procedures designed to implement Section 702.[3]

Section 706 permits Conrail to "assign, allocate, reassign, reallocate and consolidate work" in accordance with the circumstances prescribed therein. The Brotherhood of Railway Carmen ("BRC") contends that Conrail has assigned work at four locations in contravention of Section 706.[4] Conrail denies that work at three locations was covered by Section 706 and contends that the work assignment at the fourth location was in compliance with that section.[5]

At issue is whether Section 714 requires these disputes to be submitted to arbitration or requires the Special Court to hear and decide these matters. The defendant contends that the Special Court has original and exclusive jurisdiction over Section 702 and Section 706 disputes under Section 1152 of the NRSA, thereby bringing these disputes within the exception to arbitration provided under Section 714. Furthermore, the defendant argues that the determination of statutory rights by an arbitration panel violates Article III of the United States Constitution.

The plaintiffs contend that Section 714 authorizes the Adjustment Board provided under Section 3 First, 45 U.S.C. § 153 First, of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* to hear disputes

---

1. Stipulation of Facts ¶ 6.

2. *Id.*

3. Stipulation of Facts ¶ 16.

4. Stipulation of Facts ¶¶ 21–23.

5. Stipulation of Facts ¶¶ 24–25.

involving Sections 701, 702, 705, 706, 707 and 709 of Title VII of the 3R Act and that to preclude the Adjustment Board from hearing such disputes would render Section 714 superfluous. Furthermore, plaintiffs contend that Congress, faced with the long-established practice of resolving employer-employee disputes in the railroad industry through arbitration, intended to maintain this practice.

## DISCUSSION

Section 714 provides as follows:

Any dispute or controversy with respect to the interpretation, application, or enforcement of the provisions of this title, except sections 703, 704, 708 and 713, or section 1144 of the Northeast Rail Service Act of 1981, and except those matters subject to judicial review under section 1152 of the Northeast Rail Service Act of 1981 which have not been resolved within 90 days, may be submitted by either party to an Adjustment Board for a final and binding decision thereon as provided in section 3 of the Railway Labor Act, in which event the burden of proof on all issues so presented shall be on the Corporation, or the Association, where appropriate.

The plain language of this section requires that any dispute regarding the interpretation, application, or enforcement of all but four specifically excepted sections of Title VII be submitted to arbitration, unless the dispute is subject to judicial review under Section 1152. Under Section 1152(a), the Special Court's jurisdiction is delineated as follows:

Notwithstanding any other provision of law, the special court shall have original and exclusive jurisdiction over any civil action—

(1) for injunctive, declaratory, or other relief relating to the enforcement, operation, execution, or interpretation of any provision of or amendment made by this subtitle, or administrative action taken thereunder to the extent such action is subject to judicial review;

(2) challenging the constitutionality of any provision of or amendment made by this subtitle;

(3) to obtain, inspect, copy, or review any document in the possession or control of the Secretary, Conrail, the United States Railway Association, or Amtrak that would be discoverable in litigation under any provision of or amendment made by this subtitle; or

(4) seeking judgment upon any claim against the United States founded upon the Constitution and resulting from the operation of any provision of or amendment made by this subtitle.

The language in the first subsection is, of course, broad enough to confer jurisdiction on the Special Court where disputes arising under Title VII are involved. Thus, the exception to arbitration provided in Section 714 is capable of swallowing the general rule requiring arbitration.

■ A court should, however, construe a statute "so as not to render one part inoperative." *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1978). In order to resolve the conflict in the statute, the defendant suggests that the arbitrator's role under Section 714 is limited to resolving Title VII contract disputes or serving as masters to the Special Court, while statutory disputes must be left to the Special Court's jurisdiction. Such a construction of the statute is not justified. Section 714, on its face, empowers arbitrators to resolve disputes with respect to the statutory rights of parties. If Congress intended to limit the arbitrator's role to the resolution of contract disputes, it could have stated so explicitly.

An even more important consideration in our rejection of the defendant's argument, however, involves the limited applicability of existing collective bargaining agreements to the job stabilization measures of the NRSA amendments to the 3R Act. This court has repeatedly noted that in enacting the NRSA, Congress was concerned with the problem of overmanning and believed it to be an impediment to Conrail's financial viability. *Keeler v. Con-*

*solidated Rail Corporation,* 582 F.Supp. 1546, 1549 (Regional Rail Reorg.Ct.1984); *Norfolk and Western Railway Company v. Public Utilities Commission of Ohio,* 582 F.Supp. 1552, 1557 (Regional Rail Reorg.Ct.1984); *United Transportation Union v. Consolidated Rail Corporation* (*"Cannon"*), 535 F.Supp. 697, 701–705 (Regional Rail Reorg.Ct.1982), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2960, 73 L.Ed.2d 1350 (1982). In view of this concern we held, in *Cannon,* that a collective bargaining agreement predating the effective date of the NRSA could not limit the operation of Section 702. 535 F.Supp. at 705. Indeed, the long history of "[t]he efforts of the nation's railroads to rid themselves of what they consider to be unnecessary firemen and second and third brakemen," 535 F.Supp. at 701, citing *Chicago & N.W.R. Co. v. United Transportation Union,* 402 U.S. 570, 573, 91 S.Ct. 1731, 1733, 29 L.Ed.2d 187 (1971), makes it clear that Congress intended the NRSA to displace the job stabilization provisions of Conrail's collective bargaining agreements.

This conclusion is bolstered by the presence of Section 708 entitled New Collective-Bargaining Agreements. 45 U.S.C. § 797g. This section provides for Conrail and the unions to negotiate collective bargaining agreements covering the rate of pay, rules, and working conditions, but, prior to April 1, 1984, prohibited them from negotiating for any job stabilization provisions which exceeded or conflicted with Title VII. Of course, pursuant to Section 702(f), the parties may agree to procedures to implement Section 702, but this subsection also provides that "the absence of such agreement shall not interfere with implementation of the separations authorized by this section." Thus, not only did Congress replace the job protection measures of earlier collective bargaining agreements with its own scheme, but it intended this scheme to be self-executing in the absence of any contrary agreement. In view of the government's regulation by statute of an area traditionally regulated by contract, it is implausible to suggest that Section 714

should apply only to the resolution of contract disputes.

While not all of the provisions of Title VII were intended to replace the job stabilization measures of earlier collective bargaining agreements, most of the provisions of Title VII not expressly excepted from the scope of Section 714 relate to aspects of employer-employee relations that would also have been covered by collective bargaining agreement. *See* Section 705, Election and Treatment of Benefits; Section 706, Assignment of Work; Section 707, Contracting Out; Section 709, Employee and Personal Injury Claims. The Explanatory Statement of the House and Senate Conferees indicates that Congress intended disputes arising under each of these sections to be subject to arbitration under the provision that was to become Section 714:

> *This section requires that any minor dispute or claim arising under this title shall be subject to binding arbitration under normal Railway Labor Act processes. Resolution of disputes under agreements referenced in this title are already within the purview of the Railway Labor Act and no special provision is required in the bill.* This section would make clear that, even if a labor transfer agreement is not reached under section 414–3, the parties would be free to interpret and apply the provisions of this title by agreement; and any subsequent minor dispute or claim would be resolved in accordance with the guidance provided by such agreement. (emphasis added)

Explanatory Statement of the House and Senate Conferees With Respect to Subtitles E, F, and G of Title XI of the Omnibus Reconciliation Bill, 127 Cong.Rec. H5963 (daily ed. August 4, 1981) ("Explanatory Statement").

Congress drew an analogy between the disputes subject to arbitration under Section 714 and disputes subject to arbitration under the RLA. Under the RLA, disputes arising under collective bargaining agreements that are characterized as minor are required to be submitted to the Adjustment

Board established pursuant to Section 3 First. *Andrews v. Louisville & Nashville R.Co.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). A minor dispute "relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Elgin, Joliet & Eastern Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). Major disputes, on the other hand, arise "over the formation of collective agreements or efforts to secure them" and "present the large issues about which strikes ordinarily arise ..." *Id.* at 723–724, 65 S.Ct. at 1290. *See also, Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railway Company*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

■ Thus, in referring to the term "minor dispute" in the Explanatory Statement, the House and Senate Conferees did not invent a phrase which had no prior content. Rather, they were referring to a well established term of art. We conclude that in enacting Section 714, Congress intended those provisions of Title VII out of which a minor dispute would arise if they were part of a collective bargaining agreement to be subject to arbitration. As the second sentence of the Explanatory Statement, quoted above, indicates, Congress believed that agreements between Conrail and the unions made pursuant to the provisions of Title VII would be subject to arbitration under the RLA, but that a special provision was needed to ensure that similar disputes over statutory terms would be resolved in the same manner. Thus, Congress intended the arbitration provided for in Section 714 to resolve statutory disputes.

Moreover, as a matter of common sense, the defendant's construction of Section 714 cannot stand. An illustration is provided by the underlying Section 702 dispute in the case *sub judice*. The parties dispute the meaning of the word "crew" in Section 702(e)(2).[6] It would make little sense for an arbitration panel to determine that, under the parties' agreement, a crew has one particular meaning, only to have the Special Court hold that, under the statute, it means something else.

For the foregoing reasons, we hold that disputes involving the interpretation, application, or enforcement of Sections 701, 702, 705, 706, 707, and 709 of Title VII that would be characterized as minor if they were part of a collective bargaining agreement are subject to arbitration under Section 714.[7]

The defendant next argues that even if Congress intended disputes arising under various Title VII provisions to be subject to arbitration, the determination of statutory rights by arbitration violates Article III of the Constitution of the United States. The defendant principally relies on the Supreme Court's decision in *Northern Pipeline Co. v. Marathon Pipeline Co. ("Northern Pipeline")*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) which held that the jurisdiction granted to the bankruptcy courts under 28 U.S.C. § 1471 (1976 ed. Supp. IV) is unconstitutional. We do not believe that Article III, as construed by the court in *Northern Pipeline*, prohibits disputes arising under Title VII from being resolved through arbitration.

Article III requires that the " 'judicial Power of the United States' must be reposed in an independent judiciary." 458 U.S. at 60, 102 S.Ct. at 2866. The judicial power of the United States must be exercised by judges having the attributes prescribed in Article III. These are (1) judges who serve for life tenure subject to their continued "good Behavior" and (2) undiminished compensation during their tenure in office. Art. III, § 1.

---

**6.** Stipulation of Facts ¶¶ 10–12.

**7.** Because we conclude that arbitration boards may hear and decide statutory disputes arising under the various Title VII provisions, the special master role that the defendant would assign to an arbitration board is rendered superfluous.

Moreover, we note that under Rule 53 of the Federal Rules of Civil Procedure, the court may appoint a special master at its discretion and, therefore, no provision would have been needed in Title VII to provide for this function.

■ Without question, the Adjustment Board established under Section 3 of the RLA does not possess the attributes of an Article III judge. Disputes involving constitutional issues or private rights are required to be adjudicated by Article III judges. 458 U.S. at 57–76, 102 S.Ct. at 2864–2874. However, "it is clear that when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated—including the assignment to an adjunct of some functions historically performed by judges." *Id.* at 80, 102 S.Ct. at 2876.

The defendant contends that Congress may assign only factfinding functions to an adjunct. *Northern Pipeline* does not support this proposition. Discussing its prior opinion in *Crowell v. Benson,* upholding a scheme of administrative adjudication in determining compensation awards for employees whose work-related injuries occurred upon the navigable waters of the United States, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), the Court stated that:

> ... while *Crowell* certainly endorsed the proposition that Congress possesses broad discretion to assign factfinding functions to an adjunct created to aid in the adjudication of congressionally created statutory rights, *Crowell* does not support the further proposition necessary to appellants' argument—that Congress possesses the same degree of discretion in assigning traditionally judicial power to adjuncts engaged in the adjudication of rights *not* created by Congress. (emphasis in original)

458 U.S. at 81, 102 S.Ct. at 2877. Implicit in this language is that where the adjudication of a right created solely by Congress is at issue, Congress may assign to an adjunct some functions, in addition to factfinding duties, that are considered to be traditionally judicial in nature. This was made explicit by the Court when it stated that:

> ... when Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presump-

tions, or assign burdens of proof, or prescribe remedies; it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created. (footnote omitted)

*Id.* at 83, 102 S.Ct. at 2878.

To determine whether the bankruptcy statute placed the " 'essential attributes' of the judicial power of the United States" in a non-Article III body, the Court compared the grant of jurisdiction to the bankruptcy courts with the power delegated to the administrative agency in *Crowell.* 458 U.S. at 84–86, 102 S.Ct. at 2878–2879. The Court noted that:

> First, the agency in *Crowell* made only specialized, narrowly confined factual determinations regarding a particularized area of law. In contrast, the subject-matter jurisdiction of the bankruptcy courts encompasses not only traditional matters of bankruptcy, but also "all civil proceedings arising under title 11 or arising in or *related to* cases under title 11." 28 U.S.C. § 1471(b) (1976 ed., Supp. IV) (emphasis added).

*Id.* at 85, 102 S.Ct. at 2878.

While the arbitration panels, at issue in the case *sub judice,* are not limited to making factual determinations, the statutes that they are authorized to construe constitute a highly "particularized area of law", the proper interpretation of which can only be made with reference to "narrowly confined" factual issues. For example, in determining the meaning of the word "crew" under Section 702(e)(2), we would expect that it would be necessary to make factual findings with respect to how this word has been used in past practice. In any event, the power delegated to arbitration panels under Section 714 to hear and decide disputes arising under a limited number of Title VII provisions does not even come close to the unconstitutionally

broad grant of subject-matter jurisdiction to the bankruptcy courts.

The second comparison that the *Northern Pipeline* Court made with *Crowell* was that the "agency in *Crowell* engaged in statutorily channeled factfinding functions" while the bankruptcy courts "exercise '*all* of the jurisdiction' conferred by the [Bankruptcy] Act on the district courts, § 1371(c) (emphasis added)." *Id.* Like the agency adjudication in *Crowell*, the functions of arbitration under the NRSA are also "statutorily channeled" to the resolution of disputes arising under Title VII. Thus, the arbitration panels will not exercise all of the jurisdiction conferred on the Special Court by the NRSA under Section 1152.

Third, the Court noted that:

> ... the agency in *Crowell* possessed only a limited power to issue compensation orders pursuant to specialized procedures, and its orders could be enforced only by order of the district court. By contrast, the bankruptcy courts exercise all ordinary powers of district courts, including the power to preside over jury trials, 28 U.S.C. § 1480 (1976 ed., Supp. IV), the power to issue declaratory judgments, § 2201, the power to issue writs of habeas corpus, § 2256, and the power to issue any order, process, or judgment appropriate for the enforcement of the provisions of Title 11, U.S.C. § 104(a) (1976 ed., Supp. IV).

*Id.* (footnote omitted). The Adjustment Board under Section 3 of the RLA may make awards to the respective parties of a dispute. 45 U.S.C. § 153 First (m). Such awards may only be enforced by the district courts. 45 U.S.C. § 153 First (p). By contrast, the Special Court, under Section 1152(a)(1), may issue "injunctive, declaratory, or other relief relating to the enforcement, operation, execution, or interpreta-

tion of any provisions or amendment made by [the NRSA]."

Fourth, the Court stated that "while orders issued by the agency in *Crowell* were to be set aside if 'not supported by substantial evidence,' the judgments of the bankruptcy courts are apparently subject to review only under the more deferential 'clearly erroneous' standard." *Id.* The awards made by the Adjustment Board under Section 3 are "final and binding upon both parties to the dispute." 45 U.S.C. § 153 First (m). Accordingly, review of such awards is subject to a highly deferential standard.[8]

■ Although the limited review of the Adjustment Board is, perhaps, more similar to the scope of the review of the bankruptcy courts than the review of administrative agencies, we do not consider the limited review of arbitration awards to present an Article III problem. The purpose of binding arbitration under the RLA is to promote industrial peace and maintain uninterrupted transportation service by providing a neutral referee to resolve disputes. *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Company, supra*, 353 U.S. at 36–38, 77 S.Ct. at 638–639. This purpose would be defeated if the district courts were allowed a more expanded scope of review. Since Congress may require parties to vindicate statutory rights before particularized tribunals, we do not believe that a limited review of these tribunals presents an Article III problem where such a limitation is designed to effectuate the statutory scheme.

Finally, the *Northern Pipeline* Court stated that:

> ... the agency in *Crowell* was required by law to seek enforcement of its compensation orders in the district court. In contrast, the bankruptcy courts issue final judgments, which are binding and enforceable even in the absence of an appeal.

---

8. Section 3 First (m) provides in pertinent part:
   On such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.

*Id.* (footnote omitted). As previously mentioned, the Adjustment Board must seek enforcement in the district court. In sum, we believe that resolution of Title VII disputes by the Adjustment Board operates more like the administrative agency adjudication upheld in *Crowell* than the system of bankruptcy courts held unconstitutional in *Northern Pipeline*. Accordingly, we conclude that Article III does not prohibit arbitration panels from resolving disputes arising under Title VII.

### CONCLUSION

We conclude that Congress, having created statutory rights and obligations similar to those formerly contained in collective bargaining agreements, intended such disputes arising under Sections 701, 702, 705, 706, 707, and 709 of Title VII of the 3R Act involving the interpretation, application, or enforcement of those sections to be resolved through arbitration as provided by Section 714. Moreover, because of the limited scope and highly specialized nature of the issues to be resolved by arbitration, we conclude that the essential attributes of the judicial power have not been vested in a non-Article III body. We grant the plaintiffs' motion for summary judgment.

### ORDER

For the reasons stated in the accompanying memorandum opinion, it is hereby

ORDERED that the plaintiffs' motion for summary judgment is granted and the defendant's motion for summary judgment is denied;

DECLARED that arbitration panels may hear and decide disputes arising under Sections 701, 702, 705, 706, 707, and 709 of Title VII of the Railroad Reorganization Act of 1973, as amended by the Northeast Rail Service Act of 1981 involving the interpretation, application, or enforcement of those sections, and

FURTHER ORDERED that plaintiffs' request for a permanent injunction is granted.

/s/ Oliver Gasch
Oliver Gasch
Presiding Judge

/s/ William B. Bryant
William B. Bryant
Judge

/s/ Charles R. Weiner
Charles R. Weiner
Judge