**NORFOLK AND WESTERN RAILWAY COMPANY, CSX Transportation, Inc., and Consolidated Rail Corporation, Plaintiffs,**

v.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, Defendant,**

and

**United Transportation Union, Defendant–Intervenor.**

Civ. A. No. 93–02.

Special Court
Regional Rail Reorganization Act.

July 27, 1994.

Jeffrey S. Berlin, and Karen M. Johnston, Richardson, Berlin, & Morvillo, Washington, DC, for plaintiffs Norfolk and Western Ry. Co., CSX Transp., Inc., and Consolidated Rail Corp.

Richard E. Hitt, Gen. Counsel, for defendant Public Service Com'n of W.Va.

Clinton J. Miller, III, Gen. Counsel, for intervenor United Transp. Union.

Before: GASCH, Presiding Judge, and BRYANT and WEINER, Judges.

## MEMORANDUM OPINION AND ORDER

WEINER, Judge.

Plaintiffs, Norfolk & Western Railway Company (Norfolk & Western), CSX Transportation, Inc. (CSX), and Consolidated Rail Corporation (Conrail) (collectively the Railroads) have brought this suit against the Public Service Commission (PSC) of West Virginia to enjoin enforcement of a statute enacted by the legislature of the State of West Virginia. Defendant United Transportation Union (UTU) has joined this action as a intervenor on behalf of its rail employee membership. The Railroads assert that the statute is preempted by section 711 of the Regional Rail Reorganization Act of 1973 (Rail Act), as amended by section 1143(a) of the Northeast Rail Service Act (NRSA), 45 U.S.C. § 797j (1988). Based upon the record presented and the argument of all counsel, the Court finds that West Virginia Code § 24–3–1b(a) is preempted by section 711 and thus unenforceable.

The Railroads operate interstate rail freight lines primarily in the East and Midwest. All three operate freight trains in West Virginia. This matter concerns the use of so-called pusher locomotives. As their

name suggests, these are locomotives that are coupled to the back of trains needing assistance to clear steep grades. Once coupled, these engines literally push the train from behind, boosting the power of the main locomotive in front.

Ordinarily, pusher locomotives are operated "light", an industry term meaning uncoupled to a train, in between locales where they are needed. The Railroads also operate other locomotives light when ferrying the engines between trains or to service facilities. When a pusher or other light locomotive is run, it is normally operated with only an engineer on board.

Prior to 1988, the Railroads coupled pusher locomotives to trains via the caboose. A trainman working on the train would perform the coupling without the help of the pusher locomotive engineer. In July 1988, Norfolk & Western began to replace cabooses with end of train (EOT) devices. As with a caboose, a trainman usually performed the coupling without the help of the pusher locomotive engineer. In some remote regions, however, conductors were added to the pusher engines to assist with the EOT coupling. This way, a member of the train crew would not have to walk the length of the train to couple the pusher.

In November 1991, an agreement between the UTU and Norfolk & Western reduced the size of train crews. Thereafter, the pusher engineer performed the coupling function while the train crew remained at the front of the train. In August 1992, Norfolk & Western switched to a device called the "cut off on the fly" valve, which allows the engineer to couple his pusher engine to a train without removing the EOT device.

CSX, pursuant to its collective bargaining agreements with the union, uses two person crews aboard its pusher and other light locomotives. It has, however, successfully tested the "cut off on the fly" valve, and hopes to make use of such a device in the near future. At that time it will enter into negotiations with the relevant unions seeking to modify their agreements to allow one man crews on pusher and other light locomotives.

Conrail occasionally uses light locomotives on its West Virginia lines to perform maintenance and transfer functions. The record does not state whether Conrail uses pusher locomotives. Pursuant to Conrail's agreements with its unions, it operates light engines with a crew of one.

Effective April 8, 1993, the West Virginia Legislature passed the Pusher Locomotive Act, which calls for a minimum crew of two men on all light engines. The statute reads in pertinent part:

> Except for operation in its yards or terminals, and except where a train is being moved as an actual movement into or from another state not having a requirement of at least two persons controlling a locomotive as is required in this state pursuant to this section, no railroad may permit or require any crew-controlled locomotive power unit, including helper units, that is not attached to a train to be operated by a crew of fewer than two persons. At least one crew member shall be a federal railroad administration certified and licensed locomotive engineer within the meaning of applicable federal statutes and regulations. The second crew member shall be selected from either train service or engine service personnel: Provided, That (sic) the selection does not violate federal statutes or regulations or local collective bargaining agreements.

W.Va.Code § 24–3–1b(a) (1993).

Section 711 of the Rail Act, as amended by NRSA provides:

> No State may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation, the National Railroad Passenger Corporation, or the Amtrak Commuter Services Corporation to employ any specified number of persons to perform any particular task, function, or operation, or requiring the Corporation to pay protective benefits to employees, and no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region.

Rail Act, § 711, 45 U.S.C. § 797j. West Virginia is a "State in the Region" as defined

by the Rail Act § 102(17) & (19), 45 U.S.C. § 702(17) & (19).

■ As a threshold matter, West Virginia argues that this suit is not ripe for adjudication since it has yet to promulgate regulations putting the Pusher Locomotive Act into effect as required by the statute. It avers that where, as here, an administrative agency is involved with the implementation and enforcement of regulations promulgated pursuant to a legislative enactment, the issue cannot be ripe until the agency has definitively acted. We cannot agree.

In *Norfolk & Western Ry. v. Public Util. Comm. of Ohio,* 582 F.Supp. 1552, 1555 (Spec.Ct.R.R.R.A.1984), the Ohio PUC argued that this Court could not yet review an Ohio statute because it had not determined under state law whether it was preempted by section 711 or whether it was applicable to the plaintiff. In an opinion authored by Judge Bryant, we stated that the Special Court did not sit to review a state statute or its enforcement decision pursuant to state law. Rather the action involved the interpretation of the preemptory powers of section 711 and as such fell clearly within this Court's original and exclusive jurisdiction under section 1152(a) of NRSA. Furthermore, the Ohio PUC's authorities, all of which dealt with ripeness as applied to administrative agency decisions, were deemed inapposite. *Norfolk & Western,* 582 F.Supp. at 1555.

West Virginia's citations of authority are likewise inapposite. *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), addresses past exposure to illegal conduct, not present and imminent exposure. *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), and *Williamson County Regional Planning Comm. v. Hamilton*

*Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), are both regulatory takings cases that stand for the proposition that there can be no relief until the regulation impacting upon the property is fully applied. The Court's rationale, that prior to application, the extent of the burden and indeed whether a taking occurred at all cannot be determined, has no application *sub judice.*[1]

Here, rather, we deal with a statute that arguably runs afoul of section 711's preemption on its face. It is the statute itself that would violate the federal ban on minimum crew laws and it is only the statute that the plaintiffs challenge. Since such a challenge falls clearly within this Court's original and exclusive jurisdiction under section 1152(a) of NRSA, we find the matter is ripe for adjudication.

West Virginia and the UTU next claim that the Pusher Locomotive Act is nonetheless saved from preemption by section 205 of the Federal Rail Safety Act, 45 U.S.C. § 434 (1988), which reads:

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or stan-

---

1. Defendants' other citations are equally inapposite. *Lujan v. National Wildlife Fed.,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), is a case concerning ripeness under the Administrative Procedure Act. The APA does not apply in this case, even by analogy. *Darby v. Cisneros,* —— U.S. ——, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), deals with the failure to exhaust administrative remedies, as does *McCarthy v. Madigan,* —— U.S. ——, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). *Valley Forge Christian College v. Americans United for Separation of Church and State,*

*Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), and *Center for Auto Safety v. National Highway Traffic Safety Admin.,* 793 F.2d 1322 (D.C.Cir.1986), concern standing, not ripeness. Finally, in *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), the challenged regulation gave discretion to the regulator on whether or not to act. Therefore, absent action, no claim could lie. In the present case, the PSC of West Virginia is given no discretion.

dard, and when not creating an undue burden on interstate commerce.

45 U.S.C. § 434. West Virginia claims that the two person crew requirement for pusher locomotives is a necessary safety regulation needed to reduce the essentially local safety hazard created by the need of lengthy coal trains to traverse severe mountain grades within the state.

The Railroads claim that the Pusher Locomotive Act is merely a job protection measure that section 205 cannot save. They argue that section 711 is tantamount to action by the Secretary of Transportation, and thus the field is occupied by a federal standard. They also deny that there is any particularly local safety hazard.

This matter does not come before the Court in a vacuum. We have addressed the interplay of sections 205 and 711 on several occasions. In *Keeler v. Consolidated Rail Corp.*, 582 F.Supp. 1546 (Spec.Ct. R.R.R.A.1984), the Court considered the preemptive effect of section 711 on an Indiana minimum crew statute that allowed crew reductions where safe, but protected the employment of certain senior firemen and brakemen. Although section 205 was not directly implicated, the defendants, as in the case *sub judice,* argued that the statute was a safety measure. The Court, however, noted that the subject statute was not solely a safety measure and thus it was preempted by section 711. This view was consistent with Congress' intent that the railroads not be driven back toward bankruptcy by onerous personnel standards. *Id.,* 582 F.Supp. at 1550.

In *Norfolk & Western, supra,* 582 F.Supp. 1552, Ohio attempted to exempt certain senior employees from the effects of the repeal of their minimum crew law. Once again, the Court held section 711 to be preemptive. Similarly, in *Boettjer v. Chesapeake & Ohio Ry. Co.,* 612 F.Supp. 1207 (Spec.Ct. R.R.R.A.1985), the Court upheld the constitutionality of section 711's preemption of Indiana's minimum crew law. However, we stated that 711's reach did not extend to private minimum crew agreements between unions and railroads.

The preemptive power of section 711 is not absolute, however, as demonstrated in *Consolidated Rail Corp. v. United Transp. Union & Pennsylvania Pub. Util. Comm.,* Civil Action 81–10, slip op. (Spec.Ct.R.R.R.A. August 30, 1984). There, the Pennsylvania PUC issued an order requiring a second crewman for the operation of pusher locomotives. Conrail argued that the PUC's authority to mandate minimum crew levels was preempted by section 711 as well as section 1168(b) of NRSA.[2]

As in the case *sub judice,* the defendants asserted section 205. Under the circumstances presented, the Court found that neither the Rail Act nor NRSA worked a repeal of section 205. Rather, the Court was faced with a situation similar to the one faced by the Supreme Court in *Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981), in which two conflicting statutes facially applied to the case at hand.

Applying *Watt,* we rejected the argument of repeal by implication, favoring an interpretory regime that would give effect to both statutes. We reasoned that the primary purpose behind federal regulation of crew sizes is to promote the continued economic viability of the railroads through the elimination of excess employees. Neither the Rail Act nor NRSA addresses safety concerns. Therefore, we concluded, where the state regulation is solely related to safety, and the Secretary of Transportation has not acted, section 711 of the Rail Act and section 1168(b) of NRSA will not preempt a state statute that requires a minimum crew complement on trains.

In deciding the Pennsylvania case, we distinguished *Keeler, supra.* In the latter case, smaller crews could not be used, even where they were adequate for safe operation, unless the jobs of certain senior employees were protected. Therefore, we concluded in the Pennsylvania case that the sole focus of the regulation in *Keeler* was not safety and thus

---

2. Section 1168(b) provides:
 The operation of trains by Conrail shall not be subject to the requirement of any State or local law which specifies the minimum number of crew members who must be employed in connection with the operation of such trains.

it was preempted by section 711. *Pennsylvania Pub. Util. Comm., supra,* slip op. at 6.

■ Applying these decisions to the situation *sub judice,* we find that the statute passed by West Virginia has none of the indicia necessary to conclude that it was enacted solely for the sake of safety, thereby saving it from preemption on the basis of section 205. The statute's provision that the extra crewman shall come from the railroad's train or engine service personnel indicates that the measure is at least in part economic, rather than safety-oriented. The legislature of West Virginia made no findings relating to the safety need for extra crewmen in pusher locomotives. Further, the statute is a blanket prohibition on one person crewed locomotives, regardless of safety circumstances.

Perhaps most telling, however, are the exceptions West Virginia has permitted for locomotives coming into the State from states that do not likewise require two person crews for operations in yards or terminals. There is no rational explanation provided why an engineer-only pusher locomotive is any safer when operating in a yard or when travelling from another state than when originating in West Virginia. If West Virginia was truly interested solely in the safety of rail workers, rather than the numbers so employed, it would not have made these exceptions.

Finally, included in the record is a letter dated March 29, 1993, from Richard E. Hitt, the general counsel of the Public Service Commission, to the attorney for the West Virginia State Senate Judiciary Committee. Hitt warned the Committee, at the time the Pusher Locomotive Act was under consideration that:

> On its face, in the absence of safety related policies being set forth in the bill, the proposed legislation arguably constitutes economic legislation. In other words, its purpose is to place another person in the locomotive. I believe the courts have been fairly uniform in striking down such legislation.

(Ex. 3 to Pls.' Mem. of P. & A.) In the absence of any other legislative history or findings, the Hitt letter stands as the only indication of the Committee's purpose in drafting the legislation.

■ Since economic legislation, *i.e.,* a state enactment whose purpose is at least in part the creation or maintenance of railroad jobs, rather than a regulation solely designed to ensure worker safety, is specifically proscribed to the States by section 711, we find that the Pusher Locomotive Act is preempted by federal law. Accordingly, the declaratory and injunctive relief sought in the complaint will be granted.

### ORDER

Judgment is ENTERED in favor of plaintiffs Norfolk & Western Railway Company, CSX Transportation, Inc., and Consolidated Rail Corporation and against defendants Public Service Commission of West Virginia and United Transportation Union.

The Court DECLARES that the Pusher Locomotive Act, enacted as Article 3, Chapter 24, Section 1b of the Code of West Virginia is preempted by section 711 of the Regional Rail Reorganization Act of 1973, as amended by section 1143(a) of the Northeast Rail Service Act.

The Public Service Commission of West Virginia is PERMANENTLY ENJOINED from enforcing the provisions of the Pusher Locomotive Act through the adoption of rules or otherwise.

IT IS SO ORDERED.